**FERRARA LAW GROUP, P.C.**
Ralph P. Ferrara, Esquire (ID #024521985)
50 W. State Street, Suite 1100
Trenton, New Jersey 08608
P: (609) 571-3738
F: (609) 498-7440
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

<table>
<tr>
<td>

**DEBORAH GROSS-QUATRONE AND JOSEPH QUATRONE,**

*Plaintiffs,*

v.

**STATE OF NEW JERSEY; JUDGE GLENN A. GRANT, individually and in his official capacity as Acting Administrative Director of the New Jersey Courts; JOHN DOE ENTITIES 1-20 AND INDIVIDUAL JOHN AND JANE DOES 1-20,**

*Defendants.*

</td>
<td>

Civ. A. No. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

</td>
</tr>
</table>

## COMPLAINT

Plaintiffs Deborah Gross-Quatrone ("Plaintiff" or "Gross-Quatrone") and Joseph Quatrone ("Quatrone") by and through their attorneys and by way of Complaint against Defendants State of New Jersey, Judge Glenn A. Grant, in his individual capacity and in his official capacity as Acting Administrative Director of the New Jersey Courts, John Doe Entities 1-20 and Individual John and Jane Does 1-20 (collectively "Defendants") allege and state the following:

### I.    PARTIES

1.    Plaintiff Deborah Gross-Quatrone is, and at relevant times has been, a resident of the County of Bergen in the State New Jersey. Plaintiff is a Judge of the Superior Court of the State of New Jersey.

1

2.      Plaintiff Joseph Quatrone ("Quatrone") is Plaintiff Gross-Quatrone's husband, and at all relevant times has been, a resident of the County of Bergen in the State of New Jersey.

3.      Defendant State of New Jersey is Plaintiff's employer.  More specifically she is employed by the New Jersey Judiciary.

4.      Defendant Judge Glenn A. Grant is a Judge of the Superior Court of the State of New Jersey and the Acting Administrative Director of the New Jersey Courts as appointed by the Chief Justice of the New Jersey Supreme Court on September 1, 2008.  Judge Glenn A. Grant is being sued in his individual capacity and in his official capacity as the Acting Administrative Director of the New Jersey Courts.

5.      Defendants John Doe Entities 1-20 are pubic and/or private entities whose identities are presently unknown but who are believed and therefore alleged to be citizens and residents of the State of New Jersey and to have participated in the decision to deny disability benefits to Plaintiff.

6.      Defendants Jane and John Does 1-20, inclusive, are individuals whose identities are presently unknown but who are believed and therefore alleged to be citizens and residents of the State of New Jersey and who have participated in, conspired in and/or aided and abetted the decision to deny disability benefits to Plaintiff and as to the causes of action herein.

## II.      JURISDICTION AND VENUE

7.      One of Plaintiff's claims is brought pursuant to Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq., and, therefore, jurisdiction is proper under 28 U.S.C. § 1331.  Jurisdiction over Plaintiff's state law claims is proper under 28 U.S.C. § 1367 and no appropriate state law forum exists for Plaintiff's state claims to be heard.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this judicial district and all events giving rise to the claims occurred in this judicial district.

9.     This Court has jurisdiction pursuant to the federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq. to issue declaratory relief regarding Plaintiff's right to a disability retirement.

## III.     FACTS

10.     On March 3, 2015, Plaintiff was appointed as a Judge to the Superior Court for the State of New Jersey.  It was her understanding that she would be assigned to Bergen County where Plaintiff resided and continues to reside.

11.     Prior to becoming a judge, Plaintiff had a very successful career as an attorney in private practice in Bergen County.  She served as a municipal court judge in Saddle Brook.  She also was the President of the Bergen County Bar Association from 2011 to 2012 and served in numerous other capacities in Bergen County.

12.     Immediately upon being appointed to the bench Plaintiff was assigned to the Passaic Vicinage, Family Division in part based on the actions of Bergen Vicinage Assignment Judge Mizdol.

13.     Plaintiff was well received by her colleagues in Passaic County and excelled in her position for the time she served there.

14.     Effective July 6, 2015 Plaintiff was reassigned to the Bergen Vicinage.

15.     As soon as Plaintiff was transferred to the Bergen Vicinage, Plaintiff was immediately abused and harassed by the Bergen County Assignment Judge, Judge Mizdol.  This improper and unprofessional conduct included bullying, excessive cursing, harassing, and disparaging treatment for no reason by the Assignment Judge.  This continued for six (6) months.

This outrageous and unprofessional treatment caused Plaintiff health problems and ongoing, spontaneous nose bleeds.

16.     On December 21, 2015, the Plaintiff attempted to have a witness present at the meeting with the Assignment Judge Bonnie Mizdol but was denied that opportunity.

17.     After being denied a witness, Plaintiff decided to record her interaction with Judge Mizdol not to be used offensively; but for self-protection and as a defense to the mistreatment being administered by Judge Mizdol.  Plaintiff believed that recording Judge Mizdol was necessary in order to protect herself from falsehoods at the hands of Judge Mizdol due to their disparate positions within the judiciary.

18.     During the course of the meeting on December 21, 2015 the Trial Court Administrator Laura Simoldoni saw a red light in Plaintiff's purse.  Simoldoni reached into the purse to discover what it was and then pulled out the recorder and refused to return it.

19.     At the time Plaintiff was being abused repeatedly by Judge Mizdol the New Jersey Judiciary had no policy regarding who judges should go to seek assistance if they are abused by the Assignment Judge.

20.     Immediately after the incident regarding the improper seizure of the recorder, Plaintiff returned to her chambers and called Defendant Judge Glenn A. Grant as Acting Director of the Administrative Office of the Courts.   However, he refused the call.  Hours later, Plaintiff called again but Defendant Grant never accepted Plaintiff's call nor returned Plaintiff's call.

21.     On December 23, 2015, after consulting with Acting Director Judge Glenn A. Grant, Judge Mizdol filed a grievance with the Advisory Committee on Judicial Conduct ("ACJC") alleging that Plaintiff forced her law clerk to shorten two vacations that she was scheduled to take in August if she wanted the clerkship.  If true, this act would be in contravention

of Defendant Judge Glenn A. Grant's Training Memorandum dated May 20, 2015.  The grievance attached the Memorandum dated before Plaintiff's tenure in Bergen County. Plaintiff never received the Memorandum.  Notwithstanding this, the ACJC conducted an extensive investigation over the course of ten months, interviewing over 23 court employees.  Plaintiff was unaware of the filing of the grievance until almost a year later.

22.     Plaintiff eventually spoke to Defendant, Judge Glenn A. Grant when he called in early January 2016.  Plaintiff asked to come to Trenton to meet with Judge Glenn A. Grant and the Chief Justice with respect to the complaint of bullying and profanity by Judge Mizdol.  Judge Glenn A. Grant said, "that's how the Governor [Chris Christie] speaks to people, get over it!"

23.     Defendant Judge Glenn A. Grant then transferred the Plaintiff to the Essex Vicinage where she was assigned to the civil division.

24.     On March 26, 2017, a three Count Formal Complaint was filed against the Plaintiff. The attorney for the ACJC, Maureen Bauman, Esquire stated to Plaintiff's attorney, "nothing short of removal will do".

25.     Plaintiff sat in the civil division in Essex County for approximately 3 years before the ethics complaint was adjudicated.

26.     During that three-year period Plaintiff again excelled in Essex County as she did in Passaic County.

27.     Plaintiff was warmly received by most of the judges in Essex County and during her tenure she received high praise and support from the two presiding judges of the civil division whom she served under.

28.     These two presiding judges are among the most popular and well-respected jurists in the New Jersey judiciary.  One of these presiding judges went to the extreme of volunteering to testify on her behalf and in support of Plaintiff during her ethics hearings.

29.     A formal Advisory Committee on Judicial Conduct hearing was held on January 8, 9, and 10 of 2019 wherein all parties' testimony was taken and preserved except for the Plaintiffs. According to the ACJC, the memory card used to record the Plaintiff's testimony on January 8, 2018 was defective and no data could be extracted from the day's proceedings.

30.     On May 6, 2017, the Advisory Committee on Judicial Conduct dismissed the actual charges brought against the Plaintiff but found her guilty of an ethical infraction of recording her Assignment Judge even though that was not what she was initially charged with and recommended a two-month suspension in a written opinion.

31.     On January 24, 2019, the Supreme Court agreed with the decision of the Advisory Committee on Judicial Conduct.

32.     The Supreme Court decision was not consistent with the decisions on ethical charges against other judges both before and after the decision rendered against the Plaintiff. Plaintiff was suspended without pay because she tried to protect herself from a harassing and bullying Assignment judge.

33.     After Plaintiff served her 2-month suspension she remained in Essex County however instead of continuing in the civil division where she was doing remarkably well and had support from the civil presiding judge, Plaintiff was transferred to the family division.

34.     Plaintiff was subjected to a barrage of disturbing treatment at the hands of her superiors which caused great stress and significant health deterioration to the Plaintiff. The

mistreatment had a dramatic effect on the Plaintiff's well-being and ability to continue to function as she had for a long period of time.

35.    From the moment Plaintiff encountered the abusive Assignment Judge in Bergen County, up to and after her two-month suspension and continuing to the present day, Plaintiff has been subject to the inappropriate treatment.

36.    As a result of being subjected to the prolonged embarrassing treatment at the hands of the judiciary, Plaintiff's health began to deteriorate to a point where she sought extensive medical and psychological treatment as a means to deal with the breakdown she was experiencing.

37.    Plaintiff sought the professional treatment and advice from several highly respected specialists whom advised plaintiff that as a result of her physical condition and the mistreatment that she was subjected to she could no longer serve as a member of the judiciary nor make judicial decisions.   In fact, one such specialist, Ciro Randazzo, M.D., a board-certified neurosurgeon previously chosen by the judiciary to train judges opined that the Plaintiff was no longer capable of making judicial decisions after reviewing an MRI of Plaintiff's brain.

38.    Plaintiff through legal counsel and based upon the unanimous advice of her doctors, properly applied for certification towards receiving a disability pension because of her medical, physical, psychological, and emotional difficulties.

39.    The difficulties that the Plaintiff has and the conditions she suffers from clearly entitle her to the benefits and protection provided to all citizens by the Americans with Disabilities Act.

40.    Upon information and belief, Defendants have historically and consistently and uniformly processed claims by judges in good faith so that they could be properly dealt with regarding their claims for disability.

41.     This Plaintiff has been treated differently, and in fact as no judge before her has ever been treated in this way, because these Defendants, in bad faith and with an ulterior motive, have conspired to thwart her ability to receive the benefits she in entitled to in clear violation of the Americans with Disabilities Act.

42.     These Defendants have treated this Plaintiff completely differently than all other judges who have applied for a disability pension.

43.     These Defendants have refused to certify Plaintiff's application despite significant and voluminous opinions from competent medical professionals that she is no longer capable of serving in a judicial capacity.

44.     In fact, the Defendants herein have intentionally adopted an adversarial role to Plaintiff's application for disability and improperly required her to submit to a neuropsychological evaluation by a physician of their choosing. Despite repeated requests, the Defendants will not even provide the Plaintiff with the report of the physician they sent her to.

45.     Plaintiff waited over one year to learn via an Advisory Letter from Defendant, Judge Glenn A. Grant that her disability application was not certified by the Supreme Court. This delay caused Plaintiff to suffer unnecessarily, which has worsened her medical condition.

46.     Under the Americans with Disabilities Act, the Plaintiff is entitled to be treated fairly and appropriately accommodated with reference to her disability.

47.     Due to the bad faith and conspiracy on the part of the defendants herein, Plaintiff has been summarily denied the opportunity to present her claim in a proper format.

## COUNT I - AMERICANS WITH DISABILITY ACT
## (TITLE I – DISABILITY DISCRIMINATION)

48.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

49.     When Plaintiff began serving as a judge, she was not disabled.   During her employment, Plaintiff became disabled and is no longer capable of performing her duties as a judge.  Plaintiff's disability is a disability within the meaning of the ADA.

50.     The Defendants State of New Jersey and Judge Glenn A. Grant proceeded in bad faith.

51.     On May 4, 2019 the Defendant, Judge Glenn A. Grant emailed the Plaintiff requiring her to submit to a forensic neuropsychological exam and a Fitness for Duty Test and placing her on a paid administrative leave.

52.     Plaintiff hired a reputable neuropsychologist referred to her by the well-respected disability attorney whom Plaintiff had no prior relationship or affiliation and at Plaintiff's own expense.  Plaintiff forthwith submitted to a neuropsychological exam to prove her fitness for duty.

53.     The Plaintiff was devastated to learn that the neuropsychological report indicated significant cognitive deficiencies.

54.     On May 30, 2019, Judge Glenn A. Grant wrote an email and set forth the procedure for evaluating Plaintiff's disability claim.  Judge Glenn A. Grant wrote that Plaintiff must submit a two-part application and that:

> [t]he two-part application, along with medical/psychological reports from the judge's personal physicians documenting the judge's disability, should be submitted to my attention for referral to the Supreme Court.  Please note that the Supreme Court reviews and considers the medical or psychological experts provided by the judge in order to make a determination as to whether to refer the application to the Governor's Office.  Importantly, (a) in the application the judge

is required to certify that she is no longer able to perform full-time duties of a judge, and (b) her medical expert(s) must opine and make a similar finding.

Judge Glenn A. Grant confirmed that the process did not require Plaintiff undergo an IME and thus Plaintiff "no longer needs to proceed with rescheduling the postponed [IME]." Judge Glenn A. Grant concluded by instructing Plaintiff to submit her application "within the next two weeks so that we can get the matter before the Court as expeditiously as possible."

55.     Plaintiff, relying on these statements, complied with the demands of the Defendant, Judge Glenn A. Grant and filed an application for disability benefits on June 26, 2019.

56.     Despite the fact that the statute does not require it, the Defendant Judge Glenn A. Grant then mandated that Plaintiff submit to an Independent Medical Exam and Fitness for Duty Test on several occasions.  The Defendant Judge Glenn A. Grant chose a robustly criticized doctor to evaluate the Plaintiff and then selected a new doctor within that doctor's office to camouflage his actions.

57.     The disability retirement benefit is a fringe benefit of Plaintiff's employment with the Judiciary.  Plaintiff is qualified for a disability retirement benefit by virtue of her disability.

58.     Defendants are aware of Plaintiff's disability but, based on their misperception of Plaintiff's disability, Defendants have discriminated against her by denying her application for the disability benefit.

59.     Upon information and belief, Plaintiff is being treated differently based on her specific disability and due to animosity Defendants have for her.

60.     Upon information and belief, Defendants improperly delayed this process and have denied the disability benefit with the belief that Plaintiff will be forced to leave her position as a Judge.  This would leave Plaintiff with no job and without the disability benefits to which she is entitled.

61.     Thus, Plaintiff was subjected to a negative job action based on her disability.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT II - AMERICANS WITH DISABILITY ACT
## (TITLE I – REASONABLE ACCOMODATION)
## (IN THE ALTERNATIVE)

62.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

63.     Plaintiff alleges, in the alternative, that Defendants refused to make reasonable accommodations which would have made it possible for Plaintiff to continue work.

64.     Plaintiff has a disability as defined by the ADA.

65.     Plaintiff informed the employer of her condition and requested accommodations.

66.     Plaintiff requested several reasonable accommodations in order to allow Plaintiff to continue working.  These requests included a parking spot closer to her chambers, single chambers due to Plaintiff's breathing issues, an opportunity to transition back slowly and allow a period of adjustment for the plaintiff, request to leave at 4:00 p.m. daily since she would arrive at 7:00 a.m., request to handle a calendar that did not run late into the evening, request to be assigned a chambers that didn't have a lot of traffic since the Plaintiff had medical issues, request to be given more than one week to relocate chambers from civil to family, and request to continue with prescheduled doctor appointments on Tuesday afternoons as requested by the Assignment Judge in January 2016. These requests were denied.

67.     Plaintiff performed in the civil division in Essex County exceptionally well prior to her suspension.  Upon her return and immediate transfer to the Family Division under the

11

leadership of Presiding Judge David Katz there were immediate references to "his close and personal relationship" to Defendant, Judge Glenn A. Grant.

68.     Judge Katz also placed restrictions on Plaintiff, including, but not limited to, that she was not permitted to leave the Wilentz Justice Building without informing Judge Katz and receiving permission.  This restriction occurred after Plaintiff left the Wilentz Justice Building at 1:00 p.m. after having had no lunch that day to obtain a current judiciary ID at the Veterans Courthouse since hers had expired.   Judge Katz then denied Plaintiff's requests for accommodations to address Plaintiff's conditions and actually changed the previously assigned single chambers to a shared chamber.  This caused Plaintiff great stress.  All throughout this time, Plaintiff continued to suffer physical and cognitive symptoms which severely impacted on her ability to perform her duties as a Superior Court Judge.

69.     There were accommodations available that would have been effective and would not have posed an undue hardship to the employer.

70.     The employer failed to provide accommodations.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT III – DECLARATORY RELIEF

71.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

72.     There is an ongoing dispute between Plaintiff and Defendants as to whether Plaintiff is entitled to a disability retirement under the New Jersey state Judicial Retirement System.

73.     Plaintiff contends that she has a "disability" within the meaning of the statute and the Judicial Retirement System.   Defendants have taken the position that Plaintiff is not disabled.

74.     Plaintiff is entitled to a declaration that she has a "disability" which would qualify her for a disability retirement.

75.     Upon joining the State Judiciary, Plaintiff was required as a condition of employment to join the Judicial Retirement System of New Jersey, which is a defined benefit plan administered by the New Jersey Department of Pensions and Benefits.

76.     For the added security of the members of the State Judiciary, the Judicial Retirement System provides an income if a judge becomes disabled before qualifying for a service, early, or deferred retirement.   A judge is considered disabled if:

> [The judge is] physically or otherwise incapacitated for full and efficient service to the State in a judicial capacity as determined by three physicians appointed by the Governor; and

> [The judge's] disability is certified by the Supreme Court and approved by the Governor.

The Disability Retirement benefit is 75 percent of the judge's final salary.

77.     Plaintiff is entitled to retirement disability benefits based on her documented disability.

WHEREFORE, Plaintiff demands a declaration that Plaintiff has a "disability" within the meaning of the Judicial Retirement System and statute, that Plaintiff is entitled to retirement disability benefits and judgment against the Defendants for compensatory damages which have accrued, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT IV – DUE PROCESS

78.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

79.     Plaintiff has a vested property interest in her right to a disability retirement benefit pursuant to New Jersey State statute and the Judicial Retirement System.

80.     As a result of the arbitrary and non-transparent denial of the disability retirement benefit, Defendants have failed to afford Plaintiff the due process required under New Jersey State and Federal law.

81.     These due process violations have caused Plaintiff to suffer damages, including the denial of the disability retirement benefit.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT V – BREACH OF CONTRACT / PENSION LAW

82.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

83.     Plaintiff is entitled to retirement disability benefits based on her documented disability.

84.     Despite the limited time given to complete the application and submit doctor's reports, Plaintiff saw several physicians who all concluded that Plaintiff was unable to continue in her role with the Judiciary.  Joseph Acquaviva, MD, a psychiatrist diagnosed Plaintiff with work-related Generalized Anxiety and Depression and concluded that Plaintiff is currently not able "to continue in her current position" due to her medical and psychiatric condition.  Medical notes from

Joseph Schwartz, MD, an endocrinologist conclude "Judge Gross-Quatrone should be granted disability retirement as it is reasonable to assume that her symptoms are permanent."  Alan R. Jacobs, MD, a behavioral neurologist and endocrinologist concluded that Plaintiff "has become, physical or otherwise, incapacitated for full and efficient service to the State of New Jersey in her judicial capacity."

85.     On or about June 10, 2019, Plaintiff saw Dr. Gudrun Lange.  Dr. Lange issued her report two days later indicating the Plaintiff's cognitive state is a medical disability that in all reasonable probability will be permanent and this disability prevents Plaintiff from giving full and efficient service in the performance of the Judiciary.

86.     Defendants have breached their obligations to Plaintiff by denying these benefits.

87.     Plaintiff has and will be harmed based on this denial of disability retirement benefits.

88.     Plaintiff is entitled to damages as a result of this breach.

WHEREFORE, Plaintiff demands a judgment against the Defendants for compensatory damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT VI – INTERFERENCE WITH CONTRACT

89.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

90.     Defendant Judge Grant is liable to Plaintiff for the tort of interference with a business relation or contract.

91.     Plaintiff had a protected interest in her right to a disability retirement pension.

92.     As set forth above, Defendant Judge Glenn A. Grant interfered with Plaintiff's disability retirement pension.  This interference by Defendant Judge Grant was outside of the scope of his employment.

93.     Defendant Judge Glenn A. Grant acted with malice including but not limited to, his interference and participation in the Plaintiff's disability application specifically by imposing undue burdens and obligations upon the Plaintiff as more specifically set forth herein.  Defendant intentionally interfered without justification.

94.     There was a reasonable likelihood that Defendant Judge Glenn A. Grant's interference caused the loss of Plaintiff's right to a disability retirement pension.

95.     As a result of Defendant Judge Glenn A. Grant's actions, Plaintiff suffered damages, including the loss of her disability retirement pension.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## <u>COUNT VII – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS</u>

96.     Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

97.     Defendants are liable to Plaintiff for the tort of intentional infliction of emotional distress in that (a) the acts of the Defendants and Plaintiff's emotional distress resulting therefrom were the result of intentional and/or reckless conduct on the part of the Defendants; (b) the conduct was extreme and outrageous; (c) the conduct of Defendants was the proximate cause of the emotional distress sustained by Plaintiff; and (d) the emotional distress sustained by the Plaintiff

was genuine and substantial and had a demonstrative negative effect on her life and work and has forced Plaintiff to seek medical and or psychological attention.

98.     Out of fear and to show cooperation, on January 9, 2020, Plaintiff appeared for the scheduled IME with Dr. Ghilain the Defendant, Judge Glenn A. Grant unilaterally imposed and, contrary to what had been agreed upon with Human Resources through Judge Glenn A. Grant, Plaintiff's nurse observer was denied access to the exam.  Admitting their error, Human Resources, through Judge Glenn A. Grant, agreed to pay the nurse observer but Judge Glenn A. Grant informed Plaintiff through counsel that she must go through with the exam that day or be terminated.  Reluctantly and fearing termination, Plaintiff went through with the exam over the course of two days without the protection the Court had agreed to. At the conclusion of the examination, Plaintiff was told by Dr. Ghilain that her report would be completed in two weeks. Despite requests for this report, a copy of Dr. Ghilain's report has never been provided to Plaintiff and Judge Glenn A. Grant has stated it is the policy of the AOC not to share reports with their employees.  The fees for the nurse observer were never paid by Human Resources despite repeated demands.

99.     On June 16, 2020, Judge Glenn A. Grant sent an "advisory letter" directing Plaintiff return to work effective June 29, 2020 and informing her that the Supreme Court denied Certification of her disability application.  Plaintiff was denied the opportunity to be heard, to know what the Court considered in reaching its decision, to know who heard the application, to know who agreed or disagreed with the decision, to know the findings of fact, conclusions of law, and deprived the right to appeal said decision since no Order has been issued.  Plaintiff has received no record of any proceedings or anything supporting the denial of certification.

100.   On June 24, 2020, counsel for Plaintiff wrote Meryl G. Nadler, Esquire, counsel to the Administrative Office of the Courts requesting an explanation and documentation of the Supreme Court's decision to deny certification of Plaintiff's disability benefits.  Counsel also pointed out the obvious ethical and other serious implications of having a sitting judge with documented neurocognitive disorder hearing cases.

101.   Plaintiff's counsel has requested guidance on reconciling the ethical implications presented but no superior would respond.  Counsel for Plaintiff received a letter from Defendant, Judge Glenn A. Grant's counsel advising that if Plaintiff made any statement to any lawyer or litigant concerning medical opinions related to her compromised ability to make judicial decisions she would be subject to Advisory Committee on Judicial Ethics charges.

102.   Plaintiff has been alienated from most of the legal community.  Most judicial relationships Plaintiff enjoyed since becoming a Superior Court Judge have been severed causing her to feel abandoned and deserted; causing depression, isolation and insecurity.  Many of Plaintiff's colleagues are afraid to be associated with her.

103.   As a result of the conduct of Defendants, jointly and severally, Plaintiff suffered compensatory damages, including, but not limited to her inability to perform her duties as required, including back and front pay, social security, fringe benefits, future earnings, emotional pain and suffering, embarrassment, mortification, discomposure, physical pain and suffering, attorney's fees and costs, and such other actual damages as permitted for recovery by the laws of the State of New Jersey and the United States of America.

104.   The conduct of the defendants, each of them, was willful and wanton.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## COUNT VIII -
## VIOLATION OF THE NEW JERSEY LAW
## AGAINST DISCRIMINATION: RETALIATION

105.    Plaintiff incorporates by reference the foregoing paragraphs and the paragraphs below as if fully set forth herein.

106.    By virtue of her complaints of a hostile work environment, Plaintiff engaged in a protected activity, known to Defendants, by opposing practices or acts forbidden under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.

107.    Following Plaintiff's complaints, Defendants took reprisals and adverse actions against Plaintiff, including, but not limited to failing to provide Plaintiff with her 3 year judicial review, transferring Plaintiff to Essex County from Bergen County in 2015, transferring Plaintiff from the civil division to the family division in April 2019, ordering Plaintiff to a forensic neuropsychological exam in May 2019, placing Plaintiff on administrative leave for over one year, issuing an advisory letter denying Plaintiff's disability application without findings of facts or conclusions of law, demanding to judicially monitor Plaintiff's hearings, inter alia.

108.    These actions taken against Plaintiff were taken in reprisal and retaliation against Plaintiff because Plaintiff had engaged in protected activity under the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq.

109.    Defendant's actions were motivated by actual malice or were the result of willful and wanton disregard for the harm to Plaintiff.  Defendants participated in these actions with willful indifference, thus the imposition of punitive damages is justified.

110.     Defendants caused the Plaintiff to suffer economic, physical, and emotional harm along with professional humiliation as a Superior Court Judge.

WHEREFORE, Plaintiff demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

**COUNT IX -**
**PER QUOD – LOSS OF CONSORTIUM**

111.     Plaintiff Quatrone incorporates by reference the foregoing paragraphs below as if fully set forth herein.

112.     A husband is entitled to the services of his spouse in attending to the household duties, to companionship and comfort, and consortium, that is, marital relations.

113.     As a result of Defendants' actions, Plaintiff Quatrone has suffered a loss and/or impairment of the services of his spouse in attending to the household duties, to companionship and comfort and consortium.

114.     Plaintiff Quatrone is entitled to compensation for this loss and/or impairment.

WHEREFORE, Plaintiff Quatrone demands judgment against the Defendants for compensatory and punitive damages, together with reasonable attorney's fees, costs of suit and such further relief as the Court may deem just and equitable.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

Respectfully submitted,

**FERRARA LAW GROUP, P.C.**

DATE: __August 28, 2020_____          BY:/s/ Ralph P. Ferrara_____
                                               RALPH P. FERRARA, ESQUIRE
                                               Attorney for Plaintiffs Deborah Gross-
                                               Quatrone and Joseph Quatrone